# 22-2819

## United States Court of Appeals
### *for the*
## Second Circuit

Brandon Hanks, and other similarly situated individuals,

*Plaintiff-Appellant,*

v.

City of Syracuse, Kenton Buckner, In his individual capacity, Deputy Chief Richard Trudell, In his individual capacity, Deputy Chief Joseph Cecile, In his individual capacity, Captain Timothy Gay, In his individual capacity, Colin Hillman, In his individual capacity, Derek Mcgork, In his individual capacity, William Kittell, In his individual capacity, Anothony Fiorini, In his individual capacity, David Metz, In his individual capacity, Shawn Hauck, In his individual capacity, Susan Izzo, In her individual capacity, Ann Clark, In her individual capacity, Brandon Fougnier, In his individual capacity,

*Defendants-Appellees,*

Does 1-100,

*Defendant.*

## BRIEF OF PLAINTIFF-APPELLANT

| Ryder Law Firm | Bonner & Bonner | Stephen Bergstein |
|---|---|---|
| 6739 Myers Road | 475 Gate Five Rd, Suite 212 | Bergstein & Ullrich |
| East Syracuse, N.Y. 13057 | Sausalito, CA 949965 | 5 Paradies Lane |
| (315) 382-3617 | (415) 331-3070 | New Paltz, N.Y. 12561 |
| | | (845) 469-1277 |
| | | Counsel for Plaintiff-Appellant |

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Hanks' employment with City of Syracuse . . . . . . . . . . . . . . . . . . . . . . . 1

    2. Lt. Patti recommends Hanks for the Gang Violence Task Force . . . . . . . 3

    3. Hanks' coworkers investigate him in order to thwart the promotion . . . . 4

    4. Plaintiff's rebuttal to the adverse memorandum . . . . . . . . . . . . . . . . . . . 7

    5. Plaintiff suffers retaliation after filing a notice of claim . . . . . . . . . . . . 10

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

The Complaint asserts plausible discrimination claims under 42 U.S.C.
§ 1983 and Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Point I:   The Complaint asserts a disparate treatment claim under Title
            VII and Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Point II: Hanks asserts a plausible retaliation claim under Title VII
and Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Point III: The Complaint asserts a hostile work environment claim under
Title VII and Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Point IV: Hanks asserts a plausible *Monell* claim against the City . . . . . . . . . . . . 34

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## Table of Authorities

**Cases**

Anderson News, L.L.C. v. Am. Media, Inc.,
    680 F.3d 162 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Back v. Hastings on Hudson Union Free Sch. Dist.,
    365 F.3d 107 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Bickerstaff v. Vassar College,
    196 F.3d 435 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bogden-Cozmuta v. Granby Urgent Care, LLC,
    20-CV-00879 (VLB), 2022 WL 4585442 (D. Conn. Sept. 29, 2022) . . . . . 28

Burlington N. & Santa Fe Ry. Co. v. White,
    548 U.S. 53 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Chang v. Safe Horizons,
    254 Fed. Appx. 838 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Chertkova v. Connecticut Gen. Life Ins. Co.,
    92 F.3d 81 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Christiansen v. Omnicom Grp., Inc.,
    852 F.3d 195 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cotarelo v. Village of Sleepy Hollow Police Dept.,
    460 F.3d 247 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iii

DeCarlo v. Fry,
    141 F.3d 56 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Doe v. Columbia Univ.,
    831 F.3d 46 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Duplan v. City of New York,
    888 F.3d 612 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Galabya v. New York City Bd. of Educ.,
    202 F.3d 636 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hicks v. Baines,
    593 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

James v. City Univ. of New York,
    20-CV-10565 (LJL), 2022 WL 14753171 (S.D.N.Y. Oct. 25, 2022). . . . . . 26

Jenkins v. NYC Health & Hosps. Corp.,
    21-CV-2848 (JGK), 2022 WL 2833804 (S.D.N.Y. July 19, 2022) . . . . . . . 26

Joseph v. Leavitt,
    465 F.3d 87 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

L-7 Designs, Inc. v. Old Navy, LLC,
    647 F.3d 419 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

Lucente v. Cnty. of Suffolk,
    980 F.3d 284 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Lynn v. Regents of the Univ. of Cal.,
    656 F.2d 1337 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Matusick v. Erie Cnty. Water Auth.,
    757 F.3d 31 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Millea v. Metro-North R.R. Co.,
    658 F.3d 154 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Montero v. City of Yonkers,
    890 F.3d 386 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.,
    808 Fed. Appx. 19 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Price Waterhouse v. Hopkins,
    490 U.S. 228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ruston v. Town Board for the Town of Skaneateles,
    610 F.3d 55 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Texas Dept. of Community Affairs v. Burdine,
    450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Thomas v. Eastman Kodak Co.,
    183 F.3d 38 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Treglia v. Town of Manlius,
    313 F.3d 713 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

v

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 16,19, 25, 26, 27

Wray v. City of New York,
    490 F.3d 189 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 2000e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Civ. P.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 15, 16

## Jurisdiction

As Plaintiff-Appellant filed this action *inter alia* pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983, the district court had subject matter jurisdiction over this case. On September 30, 2022, the district court entered a final judgment dismissing all of Plaintiff's federal claims. (JA 194). Plaintiff timely filed a notice of appeal on October 21, 2022. (JA 193). This Court therefore has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of the Case

Plaintiff-Appellant Brandon Hanks is a police officer employed by the City of Syracuse who alleges he was (1) denied a promotion to the Gang Violence Task Force because of his race and (2) suffered retaliation after he filed a notice of claim objecting to this discriminatory treatment and the overall discriminatory work environment in the police department. The district court (Hon. Gary L. Sharpe) dismissed all of Hanks' federal claims on Defendants' motion to dismiss under Rule 12(b)(6). The district court's ruling is reported at 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022).

## Statement of Facts

### 1. Hanks' employment with the City of Syracuse.

Plaintiff Brandon Hanks began working for the Syracuse Police Department in December 2016. (JA 24 ¶¶ 18-19; JA 46 ¶ 75). He has received multiple awards

1

and commendations from the City of Syracuse and the NAACP for his professionalism and community relations, exemplified by his summer 2019 outreach program in which Hanks challenged young people to play one-on-one basketball while he was wearing his police uniform. (JA 24 ¶ 19). Hanks has also received national recognition for his progressive and community-oriented approach to policing, winning the Mayor's Achievement Award. (JA 25 ¶ 20).

Since 1980, SPD has been under a federal consent decree mandating that the City "affirmatively correct its police department's exceedingly racially disparate staffing" to mirror the African American population in Syracuse, which is approximately 30%." (JA 26 ¶ 22; JA 84-107). Hanks alleges that the City has long tolerated police conduct by failing to properly discipline officers who violate the civil rights of City residents and "pressuring its African American police officers to engage in excessive force against African American citizens as a means of garnering favor and the condition for obtaining promotion and advancement in the Department." (JA 41 ¶ 59); *see also* JA 43-44 ¶ 66 (asserting that the SPD "arrange[s] promotional opportunities to its African-American officers if they were to engage in excessive force against African Americans in the community and suspects in order to prove their allegiance to the Department. In exchange and as a quid-pro-quo arrangement, SPD leadership would officer said Officers advancement and promotional opportunities within the Department"). In contrast,

2

Hanks has utilized a community policing model by cooperating with Syracuse's African American community. (JA 19-20 ¶¶ 2-3). Hanks remains "the only African American working as a member of the Gun Violence Suppression Detail," and there are no Black members on the Gang Violence Task Force (GVTF). (JA 28 ¶ 26). This lawsuit involves Hanks' unsuccessful efforts to join the GVTF.

### 2. Lt. Patti recommends Hanks for the Gang Violence Task Force.

Due to his "high level of performance," in March 2021, Hanks' direct supervisor, Lt. Donald Patti, recommended him for promotion to the prestigious GVTF, which had potential to advance Hanks' career and would have made him the Task Force's first Black member. (JA 25, 28 ¶¶ 20, 27; JA 81 ¶ 2).

Not everyone in the Department welcomed Hanks on the GVTF. Defendants Richard Trudell, Timothy Gay, Colin Hillman, Derek McGork, William Kittell, Anthony Fiorini, David Metz, and Shawn Hauck "entered into a conspiracy to deprive [Hanks] of this career advancement . . . by publishing a memorandum that included falsehoods based on the fabrication of results derived from an unjustified and constitutionally infirm covert surveillance campaign." (JA 25 ¶ 20). The Complaint refers to these officers as the "Defendant officers." (JA 22-23 ¶ 12). These officers "informed [Hanks] they were initiating a surveillance campaign that would monitor his whereabouts and communications on account of their fabricated and unfounded claim that a gang had placed a 'hit' on his life." (JA 25 ¶ 21). The

3

Defendant officers advanced this false claim so they could "conjure incriminatory evidence that they would use to not only undermine Brandon Hanks' promotion to Gang Violence Taskforce, but to destroy his career as a police officer in its entirety." (*Id.*)

### 3. Hanks' coworkers investigate him in order to thwart the promotion.

Deputy Chief Trudell, who has admitted under oath in an unrelated lawsuit that he has referred to Blacks as "niggers" and Hispanics as "spics" (JA 28 ¶ 28; JA 29-31), ordered that Cpt. Gay "conduct a bogus investigation" in order to prevent Hanks from joining the GVTF. (JA 28 ¶ 27). The Defendant officers carried out the surveillance and investigation. (JA 32 ¶ 29).

Following the surveillance, on April 8, 2021, Cpt. Gay drafted a memorandum to Deputy Chief Trudell summarizing the "investigation." (JA 81-82). Cpt. Gay stated that after Lt. Patti offered Hanks a position on the Task Force, "GVTF personnel voiced their concern about [Hanks] accepting the offer due to known associations with gang members and convicted criminals. I was told that PO Hanks has a matching tattoo with Will Brooks, a known gang member. I, too, had reservations based upon concerns you expressed years ago to [Deputy Chief] Broton about Hanks being present at or near to SHOT incidents." (JA 81). The memo added, "I had just recently forwarded to [Deputy Chief] McGork the social media video described above and I had heard rumors of a second social media

4

video – now confirmed, in which PO Hanks was in uniform and a rap song was being played." (JA 81). Cpt. Gay further wrote that, after he spoke with McGork on March 26, 2021 and told him about "SID's [Special Investigations Division] concerns about granting the request, [Deputy Chief] McGork acknowledged the concern and said that corroborators would be required to act on those concerns and decline Lt. Patti's offer." (*Id.*)

One day after Cpt. Gay's conversation with McGork, Gay "met with members of SID – both Narcotics and GVTF – and solicited any and all information and media they may possess relative to PO Hanks." (*Id.*) As a consequence, Cpt. Gay "later received the short social media video clip of PO Hanks seated in a police car in uniform with a rap song playing." (*Id.*) That video was forwarded to McGork. (*Id.*) "In addition, four screen shots of social media posts of PO Hanks and a copy of a police report were left on a desk. I was told that the social media posts were taken from PO Hanks' social media page(s) on 26 Mar. 21 after my request. These documents were included with my bullet memo (attached) that I hand delivered to [Deputy Chief] McGork on 26 Mar. 21." (*Id.*)

Further detailing the investigation, on April 2, 2021, Cpt. Gay sent Deputy Chief Trudell "two e-mails containing the two social media videos that I had been given," adding that Hanks' social media pages have since been taken down. (JA 82). Cpt. Gay identified other concerns: (1) during Hanks' FTO training, someone

5

named Quashawn Blunt had tagged Hanks through social media to "come pick up your shirt." (*Id.*) Gang members had also asked Hanks through social media "about police related topics." (*Id.*) In addition, Cpt. Gay wrote, a patrol officer stopped a vehicle occupied by Hanks "and others believed to be gang members or convicted criminals who were drinking," one of whom "may have had a felony warrant." (*Id.*) "[A]ll occupants [of the car] were allowed to leave." (*Id.*) Also, while off-duty, Hanks "was allegedly present at a SHOTS incident on Turtle St." (*Id.*)

> In sum, Cpt. Gay wrote,
>
> PO Hanks' association with known gang members, convicted criminals – felony and RICO – known to be involved in gangs, narcotics trafficking and other criminal activity are cause for concern when considering a transfer to the Special Investigations Division. Additionally, these violations are in violation of the department's code of conduct. His related social media activity is, also, cause for concern and in violation of our rules and regulations. These behaviors also speak to Hanks' judgement and professional/personal decision making. Based on the totality of the circumstances surrounding PO Hanks I have founded and reasonable concerns that allowing him access to the Special Investigations Division may result in compromised investigations, CRIs, TTPs, confidential vehicles and covert equipment. Furthermore, we would expose our partner agencies – DEA. FBI, HSI, NYSP VGNET, OCSO SIU, etc. in a similar fashion. Certainly justifiable caution would be expected.

(*Id.*)

On March 24, 2021, Hanks was reprimanded and ordered to undergo counseling because he posted on social media a video of himself off-duty sitting in his private vehicle wearing an SPD-monogrammed turtleneck while rap music

"can be heard playing from" outside the car. (JA 34 ¶ 35). This video came to SPD's attention because of Cpt. Gay's investigation into Hanks. (*Id.*)

The investigation resulted in the denial of Hanks' assignment to the GVTF. *See* JA 25 ¶ 20 (Defendants have taken extraordinary steps to deprive Plaintiff Brandon Hanks of this promotion[]"); JA 32 ¶ 29 ("Defendants have all conspired to deprive Plaintiff Brandon Hanks of his rightful advancement within the Police Department based upon his race and upon malicious accusations that were completely and utterly manufactured for such purpose"); JA 39 ¶ 52 (asserting that the memorandum "constitut[ed] manufactured and fabricated racially-stereotypical accusations against him[]"). Hanks "was targeted by Supervisors Defendants Timothy Gay, Colin Hillman and Derek McGork, as well as his peers within the Gang Violence Taskforce. . . . [This] retaliatory conduct was comprised of being falsely and maliciously designated a 'gang member,' a 'narcotics trafficker,' 'gang affiliated,' and accused of being a person who listens to 'rap music.'" (JA 33 ¶ 33).

### 4. Plaintiff's rebuttal to the adverse memorandum.

Shortly after Plaintiff was denied the GVTF promotion, he saw Cpt. Gay's memorandum (JA 80-81) for the first time. Hanks submitted a written rebuttal. (JA 38 ¶ 50), placing his photographs and other activities in context. (JA 125). Hanks repeatedly objected to the discriminatory nature of the allegations against him and

said that "Gay did not do a thorough investigation, he instead searched for a reason for me NOT to join" SID or GVTF. (JA 129). Hanks pointed out the following:

- One photograph, taken in 2011, depicts a 17 year-old Hanks (who grew up in poverty in Syracuse (JA 125)), with a childhood friend after they got matching tattoos. Hanks no longer associates with this individual, and Hanks did not know the other person in the photo, a present-day gang member. (*Id.*) SPD cleared Hanks for employment years earlier after questioning him about this photo. (*Id.*)

- A second photo, from 2019, was taken when Hanks posed with more than 50 community members at a firefighter's birthday party; at the time, Hanks was not aware that he was posing with a gang member. (JA 126).

- As for the Facebook post in which Hanks was supporting a former gang member's clothing business, Hanks explained that this individual had "turned his life around" and, like other SPD officers, Hanks was trying to support local businesses. (JA 126-27).

- While a current gang member in a separate Facebook post directed Hanks to "come pick up your shirt," Hanks explained that he had not conducted any business with this individual. He noted that, without punishment, other SPD officers were patronizing a business that employed a gang member. (JA 127).

- Responding to the allegation that he was present during a "SHOTS incident," Hanks explained that, after hearing gunshots while picking up someone

8

from a party off-duty, he notified his supervisor and completed a police report without ever seeing the shooter or any victim or other pertinent information. (JA 127).

- Hanks also placed the rap video that he posted on Facebook in context. Hanks was sitting in a rental car, not a police vehicle, and the radio was playing rap music. Hanks wrote, "Captain Gay documented this 'incident' specifically because the music in the background was [r]ap music, indicating it was illegal to listen to rap music?" (*Id.*)

- While Hanks posted a rap lyric on social media – "The hardest thing to do in life is to refrain from slapping the shit outta somebody that deserves it" – he noted that he never threatened anyone and "I have the freedom to say whatever I want on my personal Facebook page." (JA 128). Hanks noted that his personal demeanor allows him to defuse difficult situations on the street as a police officer. (*Id.*)

- Hanks summed up the memorandum by emphasizing his role in arresting gang members and other criminals that he had grown up with in Syracuse, and that "since I became a police officer, I have never socialized with a gang member, convicted criminal, felony or RICO." (JA 129).

Hanks' rebuttal memo was ignored, as Defendants took no prompt or remedial action to prevent and remedy the racial discrimination to which Hanks had complained in that document. (JA 39-40 ¶ 53).

**5. Plaintiff suffers retaliation after filing a notice of claim.**

On June 23, 2021, Hanks filed a notice of claim that "highlighted the discriminatory culture that prevailed within the Syracuse Police Department, as well as the racially motivated and constitutionally infirm surveillance and fabricated evidence compiled in their April 8, 2021 memorandum." (JA 34 ¶ 36). After Hanks filed the notice of claim, Defendants retaliated against him. On July 1, 2021, Deputy Chief Joseph Cecile, and Police Chief Kenton Buckner disciplined Hanks by placing a second reprimand in his personnel file arising from the off-duty rap video. *Id.* at ¶ 37. Authored by Deputy Chief Cecile and presumably approved by Chief Buckner, the letter of reprimand states:

> On 04 February 2021, you posted a brief social media video wherein you are wearing what appears to be garments of your duty uniform, with visible emblem/insignia utilized by the department, while music with racial slang (nigga(s)) is being played. You also posted two other social media pictures with profane song lyrics in a caption. These posts occurred on March 21, 2020 and in December of 2020. . . .
>
> Your actions, Officer Hanks, were in violation of the Department policy number 1030.5.1 (H1), "Prohibited Speech, Expression and Conduct" in social media.
>
> It has therefore been determined that you will receive this written reprimand. You are reminded that future acts in violation of the above

policy would bring discredit upon yourself and this Department and would be dealt with more severely.

(JA 167). The two social media postings attached to the letter of reprimand each depict Hanks in his civilian clothing and recite rap lyrics. (JA 168-69).

Hanks asserts, "By resorting to a second reprimand in temporal proximity to [Plaintiff's] notice of claim filing for conduct that had already been disciplined, Defendants' actions can only be interpreted as a retaliatory gesture for the complaints Brandon Hanks levied against the SPD for its racist culture and racist attacks exacted against him intended to thwart his promotion." (JA 34-35 ¶ 37).

### Procedural History

Hanks filed this action on August 16, 2021. (JA 18). All Defendants filed a motion to dismiss under Rule 12(b)(6). (JA 147-48, 159-160, 171-72). On September 30, 2022, the district court granted these motions on all federal claims, declining to exercise supplemental jurisdiction over the state law claims. (JA 173-190). The district court ruled as follows:

1. On the Fourth Amendment claim, in violation of Rule 8, Hanks "makes no attempt to attribute any specific conduct to any individual defendant, beyond the allegation that Clark 'solicit[ed] information from [Hanks,] whose confidential interaction she then violated by publicly affirming disparaging social media posts, thus violating [Hanks'] privacy.'" (JA 179-180) (citing Compl. ¶¶ 27, 96-110). On the surveillance claims, "the complaint fails to allege who engaged in the

11

surveillance, what the surveillance entailed, or how the surveillance constituted a Fourth Amendment violation." (JA 180).

2. The district court also dismissed the Fourteenth Amendment claim on the ground that Hanks does not enumerate a theory of liability (such as equal protection) and "he makes no attempt to allege specific conduct by any defendant that would constitute a violation of any Fourteenth Amendment right, and, instead, argues generically that defendants 'engag[ed] in a conspiracy to surreptitiously investigate and surveil [him] and publish fabricated accusations that [he] was . . . 'gang affiliated,' a 'gang member,' a 'narcotics trafficker,' and someone who listens to 'rap music,' with the intention of depriving him of a career advancement, . . . thus violating [Hanks'] Fourteenth Amendment Rights.' " (JA 181) (citing Compl. ¶ 102).

3. The claims under 42 U.S.C. § 1981, 1985, and 1986 were also dismissed because precedent does not authorize such claims against public defendants (§ 1981), state officers (§ 1985), or non-viable or non-conclusory conspiracy claims (§ 1986). (JA 182-83 & n.5).

4. Nor did the Title VII claims survive the motion to dismiss. In addition to holding that Hanks cannot maintain these claims against individual defendants (JA 184), the district court held that, as for the discrimination and hostile work environment claims, "his complaint fails to allege any conduct by any defendant

12

that creates an inference of discrimination or the existence of a sufficiently severe or pervasive racially hostile work environment. Hanks' complaint is completely devoid of any specific facts indicative of racial animus beyond conclusory allegations." (JA 186). In addition, the district court dismissed the retaliation claim because, "assuming, without deciding, that Hanks has established the other elements of his retaliation claim, his claim nonetheless fails, as his written reprimand does not qualify as an adverse employment action." (JA 188).

### Questions Presented

1. Does the Complaint assert a plausible claim for racial discrimination in violation of Title VII and the Equal Protection Clause?

2. Does the Complaint assert a plausible claim for retaliation in violation of Title VII and the First Amendment?

3. Does the Complaint assert a plausible hostile work environment claim in violation of Title VII and the Equal Protection Clause?

4. Does the Complaint assert a plausible *Monell* claim against the City of Syracuse?

### Summary of Argument

The Complaint asserts plausible claims that Defendants subjected Hanks to racial discrimination in denying him the promotion to the Gang Violence Task Force, retaliating against him for objecting to this discriminatory treatment, and

13

subjecting him to a racially hostile work environment. Plaintiff also asserts a plausible *Monell* claim against the City.

On the promotion denial claim, contrary to the district court's holding, Plaintiff asserts he was denied a position on the GVTF under circumstances creating an inference of racial discrimination, therefore making out a *prima facie* case. As a means to prevent him from joining the Task Force, Hanks' White colleagues created a false narrative about him after scouring his social media account and advancing a false narrative that drew from racial stereotypes, *i.e.,* Hanks associated with gang members and listened to rap music. After Hanks filed a notice of claim, which challenged this discriminatory treatment, Defendants retaliated against him by disciplining him for a social media post that had been the subject of prior discipline against Hanks. As this response to Hanks' notice of claim would deter any reasonable employee from objecting to racial discrimination in the future, the Complaint asserts a viable retaliation claim. This evidence also supports Hanks' racial harassment claim, and his *Monell* claim against the City, as he additionally alleges that the City's widespread hostility toward Black officers led by his commanding officers cost him the promotion to the GVTF.

## Argument

## The Complaint asserts plausible discrimination
## claims under 42 U.S.C. § 1983 and Title VII

"'[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' . . . 'When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Ruston v. Town Board for the Town of Skaneateles*, 610 F.3d 55, 58-59 (2d Cir. 2010).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the plausibility test "asks for more than a sheer possibility that a defendant has acted unlawfully" (*id.*), it "does not impose a probability requirement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "[W]e have often vacated 12(b)(6) and 12(c) dismissals of

15

complaints alleging discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n. 8 (2d Cir. 2016) (citing *inter alia Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (vacating 12(c) dismissal of Title VII claim because the district court held Plaintiff to overly stringent pleading standards)). "We have also cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." (*Id*).

The district court should not resolve competing factual inferences on a motion to dismiss. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. '[F]act-specific question[s] cannot be resolved on the pleadings.' A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible").

**Point I**

**The Complaint asserts a disparate treatment
claim under Title VII and Section 1983**

This Court has outlined the pleading standards for employment discrimination cases, noting that that the Supreme Court has "established that the requirements of a *prima facie* case for a plaintiff alleging employment discrimination change as the case progresses. Ultimately, the plaintiff will be

16

required to prove that the employer-defendant acted with discriminatory motivation. However, in the first phase of the case, the *prima facie* requirements are relaxed." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). "Reasoning that fairness required that the plaintiff be protected from early-stage dismissal for lack of evidence demonstrating the employer's discriminatory motivation before the employer set forth its reasons for the adverse action it took against the plaintiff, the Supreme Court ruled that, in the initial phase of the case, the plaintiff can establish a *prima facie* case without evidence sufficient to show discriminatory motivation." (*Id.*) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) ("The *prima facie* case . . . eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. . . . [W]e presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors")).

"If the plaintiff can show (1) that []he is a member of a protected class; (2) that []he was qualified for employment in the position; (3) that []he suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary 'presumption' of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to

come forward with its justification for the adverse employment action against the plaintiff. (*Id.*)

The district court assumed without deciding that Hanks established all elements of the *prima facie* case other than the City's discriminatory motivation. (JA 186). However, the court held, "his complaint fails to allege any conduct by any defendant that creates an inference of discrimination." (*Id.*) The court added, "Hanks' complaint is completely devoid of any specific facts indicative of racial animus beyond conclusory allegations." (*Id.*) The district court failed to review the Complaint in the light most favorable to Hanks' position.

Hanks was qualified for the GVTF position, as Lt. Patti recommended him for this elite unit. As a four-year veteran with the City, Hanks had demonstrated a strong commitment to community policing and developed an outreach program within the community in which he had been raised. He also won multiple awards and commendations for his law enforcement skills. (JA 24-25 ¶¶ 18-20). As well, the failure to promote Hanks to the GVTF is among "the core activities encompassed by the term 'adverse action' as it materially alters the terms and conditions of employment." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). Hanks suffered an adverse action when the City denied him a position on the Task Force. The question is thus whether the Complaint plausibly asserts

18

that discriminatory motive caused the City to deny Hanks this position. The answer is yes.

"The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified. A plaintiff might also rely upon . . . more generally, . . . the timing or sequence of events leading to the plaintiff's termination." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996); *see also Vega*, 801 F.3d at 87 (plaintiff may defeat a motion to dismiss by "creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination").

There is nothing conclusory about Hanks' allegation that he was denied the GVTF promotion under circumstances creating an inference of discrimination. Hanks alleges that White members of the GVTF did not want a Black man on the Task Force and prepared a disparaging "investigative" report that doomed this promotion. They drafted a memorandum without his input that advanced false

19

racial stereotypes including the suggestion that Hanks affiliated with gang members and other criminals, shared a matching tattoo with a known gang member, was present when gunshots were fired in the City, and listened to rap music.

As demonstrated in Hanks' written rebuttal memorandum, these allegations were either untrue, taken out of context, or applied a double-standard, *i.e.*, objecting to Hanks' preference for rap music, a form of urban entertainment commonly associated with and performed by African-Americans. By way of example, while a photograph depicted Hanks posing with a gang member, as he pointed out in his rebuttal, that photo was taken in 2011, when Hanks was a teenager. SPD had already cleared Hanks for employment several years earlier after it questioned him about this photograph. By then, Hanks and his friend had long since parted ways. (JA 129). Other photos and visual images, in context, did not incriminate Hanks, as he either posed with members of the public at a birthday party without knowledge that gang members were present, conducted business with a former gang member who had turned his life around by starting a business in the City, never conducted any business with any other gang members, posted a rap lyric on his private Facebook page, or posted a video of himself in a car with rap music playing from an external source. (JA 125-29). Hanks further noted that White officers were patronizing businesses that employed a gang member (JA

127), and he rhetorically asked, "if the music being played in the background were Country or Rock, or any other genre[,] would it matter." (*Id.*)

While Hanks' detailed rebuttal memo reaffirmed his commitment to community policing and undercut the adverse claims against him in Cpt. Gay's memorandum, the City did not change its mind on the GVTF appointment (JA 39-40 ¶ 53), demonstrating either that the City had intended to prevent Hanks from joining the GVTF all along, or that Cpt. Gay's false memorandum – motivated by racial stereotypes – was the discriminatory link that tainted the promotion denial. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) ("the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII. This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process").

In emphasizing Hanks' taste for rap music and his false association with gang members and street criminals, the Defendant officers applied a stereotype against Black officers like Plaintiff who were raised in the inner-city. Stereotyping job applicants and employees is a form of employment discrimination. The EEOC's 2006 guidance on Title VII defines "intentional discrimination" to "include[] not only racial animosity, but also conscious or unconscious stereotypes

21

about the abilities, traits, or performance of individuals of certain racial groups."
U.S. Equal Emp. Opportunity Comm., Questions and Answers about Race and
Color Discrimination in Employment (Apr. 19, 2006), EEOC-NVTA-2006-1;[1] *see
also Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 200 (2d Cir. 2017) (citing
*Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-52, 258, 272-73 (1989)); *Thomas
v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999) ("Stereotypes or cognitive
biases based on race are as incompatible with Title VII's mandate as stereotypes
based on age or sex"); *Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337, 1343 n.
5 (9th Cir. 1981) ("[W]hen plaintiffs establish that decisions regarding . . .
employment are motivated by discriminatory attitudes relating to race or sex, or are
rooted in concepts which reflect such attitudes, however subtly, courts are
obligated to afford the relief provided by Title VII").

Apart from the false and stereotypical allegations that Hanks' colleagues
raised against him in concert, other facts in the Complaint further permit the
inference that racial discrimination motivated the City to deny him the GVTF
promotion. First, if the City really thought the allegations against Hanks were true,
it would have terminated his position with the SPD for affiliating with gang
members and other criminals. It did not do so. Hanks still works for the

---

[1] https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment

Department, having been cleared for employment following a background check only a few years earlier. The City also has a track record of racial discrimination in employment, as it remains under a consent decree to diversify the Department. (JA 27-28 ¶¶ 23-25). The Complaint further asserts that the SPD rewards Black officers with promotions when they engage in excessive force against African-Americans in the community (JA 41, 43-44 ¶¶ 59, 66), a practice that sharply contrasted with Hanks' inclusive policing, which included his positive engagements with Black residents in the City. (JA 19-20, 24 ¶¶ 2, 19). Moreover, one supervisor, Deputy Chief Trudell, who asked Cpt. Gay to investigate Hanks' social media activity and Plaintiff's background (JA 28 ¶ 27; JA 82), admitted under oath in an unrelated lawsuit that he uses vile racial language in private, including "nigger" and "spic." (JA 28 ¶ 28; JA 29-31). The Complaint plausibly alleges that Trudell's racial bias prompted him to ask Cpt. Gay to initiate the investigation intended to prevent Hanks from joining the Task Force. Not only was the investigation into Hanks' character prompted by Trudell, but this commanding officer remains on the police force despite acknowledging his own racist propensities, and as demonstrated in the Complaint, he still makes personnel decisions.

The allegations in support of Hanks' Title VII claim also support his equal protection/conspiracy claim under 42 U.S.C. § 1983. Unlike Title VII, to proceed under § 1983, Hanks must identify the individual discriminators. In dismissing the

23

§ 1983 claim, the district court held that, with few exceptions relating to the claim against Defendant Ann Clark, Hanks "makes no attempt to attribute any specific conduct to any individual defendant." (JA 179). For this reason, the district court held, the Complaint violates Rule 8(a)(2), which mandates "a short and plain statement of the claim showing that the pleader is entitled to relief." (JA 178).

The district court held that Hanks neither identified his theory of liability under the Constitution nor "alleged specific conduct by any defendant that would constitute a violation of any Fourteenth Amendment right" other than to assert that various SPD officers conspired to deprive him of a career advancement. (*Id.*) In fact, the Complaint asserts that, contrary to the Equal Protection Clause, "Deputy Chief Richard Trudell ordered Cpt. Gay to conduct a bogus investigation of Plaintiff Brandon Hanks." (JA 28 ¶ 27). At a minimum, the Complaint asserts a plausible § 1983 claim against Trudell and Cpt. Gay. More broadly, Hanks alleges that a series of named officers – Trudell, Gay, Colin Hillman, Derek McGork, William Kittell, Anthony Fiorini, David Metz, and Shawn Hauck – conspired to stop the promotion by "inform[ing] Brandon Hanks they were initiating a surveillance campaign that would monitor his whereabouts and communications on account of their fabricated and unfounded claim that a gang had placed a 'hit' on his life." (JA 25 ¶ 21). These Defendants knew this allegation "was a rouse in order to permit them to conjure incriminating evidence that they would use to"

24

undermine Hanks' promotion and terminate his career as a police officer. (*Id.*)
These officers proceeded to "investigate" Hanks, resulting in Lt. Gay's false and
stereotypic report that achieved the result they wanted: Hanks was denied a spot on
the GVTF. (JA 32 ¶ 29); *see also* JA 33 ¶ 33 (identifying Cpt. Gay, Hillman, and
McGork as having targeted Hanks during the investigation). Contrary to the district
court's holding that Hanks only advances "wholly conclusory allegations of a
'conspiracy'" (JA 183 n. 5), these allegations sufficiently apprise these defendants
of the claim against them and allow them to properly frame a response. *Salahuddin
v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

## Point II

### Hanks asserts a plausible retaliation
### claim under Title VII and Section 1983

"To establish a presumption of retaliation at the initial stage of a Title VII
litigation, a plaintiff must present evidence that shows '(1) participation in a
protected activity; (2) that the defendant knew of the protected activity; (3) an
adverse employment action; and (4) a causal connection between the protected
activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 315-16. The
same test governs retaliation claims under § 1983. *Vega*, 801 F.3d at 91 ("we hold
that for a retaliation claim under § 1983 to survive a motion for judgment on the
pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1)
defendants acted under the color of state law, (2) defendants took adverse

25

employment action against him, (3) because he complained of or otherwise opposed discrimination"). "The plaintiff's burden in this regard is '*de minimis*.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

The district court assumed without deciding that Hanks made out a *prima facie* case of retaliation under Title VII and § 1983 except for the adverse action prong. (JA 188 & n.16).[2] Hanks engaged in protected activity when he served a notice of claim on June 23, 2021 to protest the discrimination against him. (JA 34 ¶ 36). The notice of claim was protected under the Equal Protection Clause, as Hanks grieved his own discriminatory treatment. *See Vega*, 801 F.3d at 81-82. This filing was also protected under the First Amendment because Hanks objected to "the discriminatory culture that prevailed within the Syracuse Police Department." (JA 34 ¶ 36). *See Cotarelo v. Village of Sleepy Hollow Police Dept.*, 460 F.3d 247, 252 (2d Cir. 2006) ("we have repeatedly held that discrimination in a government workplace is a matter of public concern").

---

[2] While the district court dismissed Plaintiff's claim under 42 U.S.C. § 1981 because that statute does not apply to public entities (JA 182) (citing *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018)), this Court should treat that claim as brought under 42 U.S.C. § 1983. *See James v. City Univ. of New York*, 20-CV-10565 (LJL), 2022 WL 14753171, at *4 (S.D.N.Y. Oct. 25, 2022); *Jenkins v. NYC Health & Hosps. Corp.*, 21-CV-2848 (JGK), 2022 WL 2833804, at *3 (S.D.N.Y. July 19, 2022).

The issue is thus whether Hanks plausibly pled that he suffered an adverse action in alleging his retaliation claims. "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he anti-retaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Vega*, 801 F.3d at 69. This is a contextual analysis:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* at 69.

In retaliation cases, reprimands may dissuade a reasonable employee from again speaking out against workplace discrimination. *See Montero v. City of Yonkers*, 890 F.3d 386, 401 (2d Cir. 2018) ("An adverse employment action may include discharging, refusing to hire, refusing to promote, demoting, reducing the

27

pay, or reprimanding an employee"); *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) ("we think (and conclude that a reasonable jury could decide) that a letter of reprimand would deter a reasonable employee from exercising his FMLA rights. A formal reprimand issued by an employer is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy. A reasonable jury could conclude as much even when, as here, the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently"); *Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.*, 808 Fed. Appx. 19, 23 (2d Cir. 2020) (summary order) (jury could find adverse action in retaliation case "[i]n light of, among other things, the considerable number of reprimands against Pistello occurring in a relatively short period of time after her protected conduct"); *Bogden-Cozmuta v. Granby Urgent Care, LLC*, 20-CV-00879 (VLB), 2022 WL 4585442, at *7 (D. Conn. Sept. 29, 2022) ("a reasonable jury could find that the disciplinary memo constitutes an adverse employment action for the same reasons detailed in *Millea*").

Hanks asserted that, on July 1, 2021, in retaliation for the notice of claim, the City – through Deputy Chief Joseph Cecile and Police Chief Kevin Buckner – disciplined him "on the second occasion for the same offense of playing rap music,

this time with an enhanced level of discipline comprising a written reprimand included in his personnel file." (JA 34 ¶ 37). Defendants had previously disciplined Hanks on March 24, 2021 for the same social media post. (JA 34-35 ¶¶ 35-37). The July 1, 2021 discipline noted that Hanks had posted (1) a social media video depicting him in a SPD uniform and listening to rap music with "racial slang" and (2) "two other social media pictures with profane song lyrics in a caption." (JA 167). The letter advised Hanks that "future acts in violation of the above policy would bring discredit upon yourself and this Department and would be dealt with more severely." (*Id.*) Lt. Gay is also properly sued over his role in leading the investigation into Hanks' background, which foreseeably led to the letter of reprimand. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004).

Hanks alleges, therefore, that Defendants doubled down on the first written warning after he filed the notice of claim, the warning related to his off-duty protected speech and not work-related misconduct, and the City threatened him with more severe discipline in the future. Hanks' double-reprimand for conduct protected under the First Amendment was not the nonactionable "petty slight[] or minor annoyance[] that often take[s] place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Instead, the Complaint plausibly alleges this discipline would deter a reasonable

employee from again complaining about racial discrimination. No police officer wishes to endure repeated disciplinary notices in his personnel file, particularly for the sort of actions that most police officers will not suffer discipline, *i.e.,* listening to music or posting lyrics on Facebook. The warning's threat that future such violations might result in Hanks' dismissal from the Police Department (JA 167) would only further make him think twice about opposing discrimination. A rational police officer would understand that any misconduct-related dismissal would impede future job prospects and potentially terminate his career in law enforcement.

In rejecting the retaliation claims under Rule 12, the district court held that Hanks did not plausibly assert a *prima facie* case because "his written reprimand did not qualify as an adverse action." (JA 188). In support of its holding, the district court cited inapposite authority. In *Chang v. Safe Horizons*, 254 Fed. Appx. 838 (2d Cir. 2007), this Court stated that "oral and written warnings do not amount to materially adverse conduct in light of our reasoning in *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), in which we stated that '[t]he application of the [employer's] disciplinary policies to [the employee], without more, do not constitute adverse employment action.'" *Id.* at 839. But the adverse action analysis in *Joseph* covers a traditional disparate treatment claim, not retaliation claims, which carry the more favorable "dissuasion" test under *Burlington Northern v.*

30

*White*. *See Joseph*, 465 F.3d at 89 (noting the plaintiff did not challenge the district court's retaliation holding); *id.* at 91 (applying the "materially adverse change" adverse action test under *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

### Point III

### The Complaint asserts a hostile work environment claim under Title VII and Section 1983

"In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010). "This is especially so in considering claims of hostile work environment . . . And in reviewing all of the evidence to determine whether judgment as a matter of law is appropriate, 'the court must draw all reasonable inferences in favor of the nonmoving party,' 'even though contrary inferences might reasonably be drawn.'" (*Id.*)

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

31

environment,' . . . Title VII is violated, so long as there is a basis for imputing the conduct that created the hostile environment to the employer." *Id.* at 546. "Facially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." (*Id.*)

Defendants refused to hire and promote Black employees while instilling an overall discriminatory culture within its ranks. (JA 26-27, 37-38, 41 ¶¶ 22, 45, 50, 59). Hanks was offered a promotion where advancements within the ranks of the SPD were otherwise limited and foreclosed. (JA 25, 33 ¶¶ 20, 31). Defendants sought to undermine Hanks' nomination (JA 25-26, 28 ¶¶ 21, 27) by pursuing a campaign of surveillance by subterfuge (JA 25-26 ¶ 21) and a targeted scrutiny of his social media accounts. (JA 49-50 ¶ 91). As ordered and supervised by racially-antagonistic Deputy Chief Trudell (JA 28-31 ¶¶ 28-29), this campaign relied upon racially-discriminatory stereotypes (JA 33, 59 ¶¶ 33, 52) that led to disciplinary reprimands against Hanks. (JA 34-35 ¶¶ 35, 37). Moreover, Hanks and other Black officers were pressured to comply with the Department's custom and practice of employing excessive force against the Black community, a condition precedent for promotion. (JA 41, 43-44 ¶¶ 59, 66). In contrast to these discriminatory practices,

Hanks alienated his commanding officers by undertaking a community policing strategy that sought to work collaboratively with the Black community. (JA 24-25 ¶¶ 19-20). Because of his inclusive policing, Hanks' promotion to the GVTF was railroaded. (JA 28 ¶ 27). Drawing all reasonable inferences in Hanks' favor, these allegations sufficiently assert that Black officers endured a culture of discrimination where opportunities of advancement are effectively non-existent. As Hanks was victimized by this culture, Hanks makes out a hostile work environment claim under Title VII and § 1983.

In dismissing the hostile work environment claim, the district court held that Hanks did not sufficiently plead that any defendant engaged in conduct "that creates an inference of discrimination or the existence of a sufficiently severe or pervasive racially hostile work environment." (JA 186). Instead, the district court held, Hanks merely advanced conclusory allegations. (JA 187) (citing Compl. ¶¶ 41, 43). The district court further held it was not enough for Hanks to allege that the elite task forces within SPD were comprised of European Americans or that Trudell had used racial slurs while off duty. *Id.* (citing Compl. ¶ 28). As this analysis overlooked the above allegations and viewed the Complaint piecemeal, this Court should reinstate the hostile work environment claim.

33

## Point IV

### Hanks asserts a plausible *Monell* claim against the City

"Under *Monell*, '[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.' Such a policy 'may be pronounced or tacit and reflected in either action or inaction.' A municipality's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [municipality] itself to violate the Constitution.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020). "In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.' In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" *Id.* at 297-98.

"[W]hile 'isolated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability,' they can be the basis of liability if 'they were done pursuant to municipal policy, or were sufficiently widespread and persistent to

34

support a finding that they constituted a custom, policy, or usage' of which supervisors must have been aware." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014).

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). Plaintiff must also allege that "the violation of his constitutional rights resulted from a municipal custom or policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998).

The district court did not resolve the *Monell* claim on the motion to dismiss because it determined that Hanks failed to state a claim under *inter alia* § 1983. (JA 189). This Court should reverse. SPD engaged in discriminatory hiring and promotion practices through (1) a continual disregard of their consent decree with the Department of Justice (JA 25, 41 ¶¶ 22-23, 59), (2) insignificant representation of Black officers in coveted task forces/investigative units and in positions of command (JA 28, 47 ¶¶ 26, 78), (3) Department policy of refusing to promote Black officers into coveted taskforces and supervisory positions (JA 41 ¶ 59), (4) requiring Black officers to engage in excessive force against Black citizenry (JA 41, 43-44 ¶¶ 59, 66), and (5) promoting and failing to discipline White

35

commanding officers who have exhibited racially insensitive and discriminatory conduct. (JA 41 ¶ 59). In contrast to these practices, Hanks employed community-policing with the Black community. (JA 24-25, 43-44, 46 ¶¶ 19-20, 66, 74). Upon Hanks' nomination to the GVTF, Deputy Chief Trudell and Cpt. Gay, head of the SPD special units, including the GVTF, initiated a campaign to undermine Hanks' nomination by marshalling "evidence" reflecting Hanks' purported unfitness for the promotional opportunity. (JA 25-26, 28, 39, 58-59 ¶¶ 21, 27, 52, 128). On account of this campaign, the City denied Hanks promotional nomination. (JA 36-38, 48 ¶¶ 43, 50, 82).

These allegations permit the inference that the City had maintained a workplace environment that was hostile to Black officers, particularly those who desired a promotion to prestigious task forces like the GVTF. As the Complaint alleges that this environment led the City to deny Hanks' promotion, he makes out a plausible *Monell* claim against the City.

36

## Conclusion

This Court should reinstate the Plaintiff's discrimination, hostile work environment, retaliation and *Monell* claims brought under Title VII and Section 1983.

Dated: February 10, 2023

Respectfully submitted,

Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277

Law Offices of Bonner & Bonner
475 Gate Five Road, Suite 212
Sausalito, California 949965
(415) 331-3070

Ryder Law Firm
6739 Myers Road
East Syracuse, New York 13057
(315) 382-3617
*Counsel for Plaintiff-Appellant*

37

## Certification

Stephen Bergstein, counsel for Plaintiff-Appellant, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is 14 point. The brief contains 8,533 words.

Stephen Bergstein